UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -   x

UNITED STATES OF AMERICA

    - v. -

ERICSSON EGYPT LTD.,

    Defendant.

- - - - - - - - - - - - - - - - - - -   x

**SUPERSEDING**
**INFORMATION**

(S1) 19 Cr. ____

**19 CRIM 884**

The United States charges:

## GENERAL ALLEGATIONS

### Relevant Statutory Background

1. The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, et seq. ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

2. In relevant part, the FCPA's anti-bribery provisions prohibit any issuer of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, or required to file periodic reports with the United States Securities and Exchange Commission ("SEC") under Section 15(d) of the Securities Exchange Act, 15 U.S.C. § 78o(d) (hereinafter "issuer"), or affiliated persons, from making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to

pay, or authorization of the payment of money or anything of value to any person while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to a foreign official for the purpose of assisting in obtaining or retaining business for or with, or directing business to, any person. 15 U.S.C. § 78dd-1(a)(3).

**LM Ericsson, ERICSSON EGYPT, and Other Relevant Entities and Individuals**

3.  From in or about and between 2000 and 2016 (the "relevant time period"), LM Ericsson was a multinational telecommunications equipment and service company headquartered in Stockholm, Sweden. LM Ericsson maintained a class of securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 and was required to file periodic reports with the SEC. Accordingly, during the relevant time period, LM Ericsson was an "issuer" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-1. LM Ericsson was a holding company operating worldwide through its subsidiaries and affiliated entities. The subsidiaries acted as divisions of the parent, rather than separate and independent entities. LM Ericsson and its subsidiaries, combined, have approximately 100,000 employees.

4.  During the relevant time period, ERICSSON EGYPT Ltd. ("ERICSSON EGYPT"), the defendant, was a majority-owned subsidiary and operating entity of LM Ericsson. Individual employees of ERICSSON EGYPT oversaw Ericsson's operations in North East Africa, a region that included the country of Djibouti. ERICSSON EGYPT's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

5.  During the relevant time period, Ericsson AB was a wholly-owned subsidiary of LM Ericsson that served as one of LM Ericsson's largest operating companies.

Ericsson AB's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

6. "Employee 1," was an employee of a wholly-owned indirect subsidiary of LM Ericsson and acted as an agent of LM Ericsson. In or about and between May 2010 and June 2012, Employee 1 was the Head of the Customer Unit in North East Africa ("CU NEA"), a region that included Djibouti. Employee 1 left the Company in 2013. Employee 1 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

7. "Employee 2," was an employee of ERICSSON EGYPT and acted as an agent of LM Ericsson. In or about and between November 2010 and October 2012, Employee 2 served as the VP of New Business Development for the Horn of Africa, a region that included Djibouti. Employee 2 reported to Employee 1. Employee 2 left the Company in 2015. Employee 2 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

8. "Employee 3," was an employee of a wholly-owned subsidiary of LM Ericsson and acted as an agent of LM Ericsson. In or about and between April 2010 and June 2014, Employee 3 was a high-level executive in the Middle East and Africa region, a region which included Djibouti and Kuwait. Employee 1 reported to Employee 3. Employee 3 left the Company in 2017. Employee 3 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

9. "Employee 4," was an employee of a wholly-owned indirect subsidiary of LM Ericsson and acted as an agent of LM Ericsson. In or about and between July 2011 and December 2012, while on a long term assignment with ERICSSON EGYPT, Employee 4 served as the Customer Unit Controller for North East Africa, including Djibouti. Employee 4 reported

to Employee 3. Employee 4 left the Company in 2015. Employee 4 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

### Foreign Entities and Officials

10. During the relevant time period, "Telecom Company," an entity whose identity is known to the Fraud Section, the Office, and ERICSSON EGYPT, was a state-owned telecommunications company in Djibouti. Telecom Company was controlled by the Djibouti government and performed a function that the Djibouti government treated as its own. Telecom Company was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

11. During the relevant time period, "Foreign Official 1," was a high-ranking government official in the executive branch of the government of Djibouti. Foreign Official 1 had influence over decisions made by Telecom Company. Foreign Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

12. During the relevant time period, "Foreign Official 2," was a high-ranking government official in the executive branch of the government of Djibouti. Foreign Official 2 used his influence with the government of Djibouti to affect and influence the acts and decisions of Telecom Company. Foreign Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

13. During the relevant time period, "Foreign Official 3," was the CEO of Telecom Company. Foreign Official 3 had influence over decisions made by Telecom Company. Foreign Official 3 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

### Third Party Agents and Consultants

14. During the relevant time period, "Consulting Company," an entity whose identity is known to the Fraud Section, the Office, and ERICSSON EGYPT, was a private consulting company that was formed in Djibouti. Consulting Company was registered to the spouse of Foreign Official 2, and Foreign Official 2 acted as a representative of Consulting Company.

### Overview of the Djibouti Bribery Scheme

15. In or about and between 2010 and 2014, LM Ericsson, through certain of its agents, including ERICSSON EGYPT, Ericsson AB, Employee 1, Employee 2, Employee 3, Employee 4, and others knowingly and willfully conspired and agreed with others to corruptly provide approximately $2,100,000 in bribe payments to, and for the benefit of, foreign officials in Djibouti, including Foreign Official 1, Foreign Official 2, and Foreign Official 3, in order to secure an improper advantage in order to obtain and retain business with Telecom Company and to win a contract valued at approximately €20,300,000 with Telecom Company (the "Telecom Company Contract").

16. In order to conceal the true nature of the approximately $2,100,000 in bribe payments, Employee 2 completed a draft due diligence report that failed to disclose the spousal relationship between the owner of Consulting Company and Foreign Official 2. Further, certain agents of LM Ericsson caused Ericsson AB's branch office in Ethiopia to enter into a sham contract with Consulting Company and to approve fake invoices in order to further conceal the bribe payments.

17. In furtherance of the scheme, conspirators, including Employee 2 and Foreign Official 2, used U.S.-based email accounts to communicate with each other and other individuals about the scheme.

18. In addition, the $2,100,000 in bribe payments that LM Ericsson, through certain of its agents, including Ericsson AB, ERICSSON EGYPT, and an employee of ERICSSON EGYPT made and caused to be made to Consulting Company were routed into and out of correspondent bank accounts at financial institutions in New York, New York.

## Details of the Djibouti Bribery Scheme

19. Specifically, in or about May 2010, Telecom Company informed Ericsson AB that Telecom Company was planning to modernize the mobile networks system in Djibouti, and that Ericsson AB was selected to participate in a tender for the business.

20. Subsequently, in or about 2010, Employee 2 informed Employee 1 that Ericsson AB could win the Telecom Company Contract if Ericsson AB paid bribes to government officials in Djibouti.

21. Subsequently, in or about 2010, Employee 1 and Employee 2 travelled to Djibouti to meet with Foreign Official 2 and Foreign Official 3. During this trip, Foreign Official 2 informed Employee 1 that Foreign Official 1 needed to be paid a bribe of €1,000,000, a portion of which would be passed along to Foreign Official 3. In return, Ericsson AB could win the Telecom Company Contract.

22. After the trip to Djibouti, in or about July 2010, Employee 1 informed Employee 3 that Ericsson AB could win the Telecom Company Contract if it paid bribes to Djibouti government officials. Employee 3 instructed Employee 1 to ensure that the bribe payments were tied to other costs associated with the Telecom Company Contract.

23. On or about October 25, 2010, Ericsson AB responded to the tender and submitted its bid to Telecom Company.

24. On or about May 11, 2011, Telecom Company awarded the Telecom Company Contract to Ericsson AB, a contract valued at approximately €20,300,000.

25. On or about June 16, 2011, Ericsson AB's branch office in Ethiopia and Consulting Company signed a consulting agreement. The services contemplated in the contract were never intended to be performed.

26. On or about June 26, 2011, Foreign Official 2 sent Employee 2 an invoice from Consulting Company requesting payment of €1,000,000 for 5,000 hours of purported work that was never performed.

27. On July 24, 2011, Employee 2 sent Employee 1 an email stating, "[Foreign Official 3] is on vacation until the 28th of July so not much will happen before he gets back... Maybe it will be better to pay the 1 M to [Foreign Official 1] and [another foreign official] so things can be pushed from them. What do you think?" Employee 1 responded on or about July 26, 2011, "We need to book the contract before doing any $."

28. Following additional delays in getting the bribe payment of €1,000,000 approved, Employee 1 sent a series of emails detailing the pressure Employee 1 was receiving from Djibouti government officials for the bribe payments to be made.

29. On or about August 14, 2011, Employee 1 emailed Employee 4, "I got a call from [Foreign Official 2] and he wants to know when we will wire..."

30. On August 14, 2011, Employee 1 emailed Employee 2 and Employee 4, and others, "Gents I just got another call from [Foreign Official 2]. We need to wire the payment within the current week."

7

31. On or about August 17, 2011, Employee 1 emailed Employee 4 and others, "I just got now a call from the cabinet of [Foreign Official 1]. I really need we to wire the $."

32. On or about August 18, 2011, Employee 1 emailed Employee 4 and others, attaching an invoice from Consulting Company requesting the payment of €1,000,000, writing, "Hi, please find attached the invoice signed by me. Tell me what can I do to make this happen fast. I am getting strong pressures from [Foreign Official 1]. This is not nice."

33. On or about August 18, 2011, Employee 2 emailed Employee 1 and Employee 4, and others, "As you said on your email below we have to pay the invoice ASAP . . . Everybody in the management of [Telecom Company] & in the ministry are waiting their part of the cake."

34. On or about August 22, 2011, Employee 2 emailed Employee 1, Employee 4, and others, attaching a draft due diligence report on Consulting Company. The draft due diligence report failed to disclose the spousal relationship between the owner of Consulting Company and Foreign Official 2.

35. On or about August 24, 2011, Ericsson AB's branch office in Dubai transferred approximately $1,441,050 – the approximate equivalent at the time of €1,000,000 – to Consulting Company. Bank records show that the funds were wired through correspondent bank accounts in New York, New York, to Consulting Company's bank account at a bank in Djibouti.

36. On or about August 29, 2011, Employee 2 emailed Employee 4 a second invoice from Consulting Company, requesting a payment of €122,000 for 610 hours of purported work that was never performed.

8

37. On or about October 27, 2011, Ericsson AB's branch office in Dubai transferred approximately $171,703 – the approximate equivalent at the time of €122,000 – to Consulting Company. Bank records show that the funds were wired through correspondent bank accounts in New York, New York, to Consulting Company's bank account at a bank in Djibouti.

38. On or about January 27, 2012, Employee 2 sent Employee 4 a third invoice from Consulting Company, requesting a payment of €414,000 for 2,070 hours of purported work that was never performed.

39. On or about March 9, 2012, Ericsson AB's branch office in Dubai transferred approximately $545,230 – the approximate equivalent at the time of €414,000 – to Consulting Company. Bank records show that the funds were through correspondent bank accounts in New York, New York, to Consulting Company's bank account at a bank in Djibouti.

40. Ericsson AB continued to perform on the Telecom Company contract through 2014.

41. In or about January 2014, Ericsson AB sent an invoice to Telecom Company A in order to receive the final payment under the Telecom Company A contract.

42. On or about January 31, 2014, Ericsson AB received its last payment for its performance on the Telecom Company A contract. LM Ericsson, through Ericsson AB, earned approximately $7,000,000 in profits from the Telecom Company A contract.

## STATUTORY ALLEGATIONS

### COUNT ONE
(Conspiracy to Violate the Antibribery Provisions of the FCPA)

43. Paragraphs 1 through 40 of this Information are realleged and incorporated by reference as if fully set forth herein.

44.     From at least in or about and between 2010 and 2014, in the Southern District of New York and elsewhere, ERICSSON EGYPT, the defendant, together with LM Ericsson, Ericsson AB, Employee 1, Employee 2, Employee 3, Employee 4, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, that is, to violate the anti-bribery provisions of the FCPA.

45.     It was a part and object of the conspiracy that ERICSSON EGYPT, the defendant, together with LM Ericsson, being an issuer, Ericsson AB, Employee 1, Employee 2, Employee 3, Employee 4, and others known and unknown, would and did make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist LM Ericsson in obtaining and retaining business for and with, and directing business to, LM Ericsson, Ericsson AB, ERICSSON EGYPT, and others, in violation of Title 15, United States Code, Section 78dd-1(a).

### Manner and Means of the Conspiracy

46. The manner and means by which ERICSSON EGYPT and its co-conspirators sought to accomplish the objects of the conspiracy included, among other things, the following:

    a. LM Ericsson, through certain of its employees and agents, including ERICSSON EGYPT, the defendant, Ericsson AB, Employee 1, Employee 2, Employee 3, Employee 4, and others known and unknown, discussed the payment of, and paid, approximately $2,100,000 in bribe payments to, and for the benefit of, foreign officials in Djibouti, including Foreign Official 1, Foreign Official 2, and Foreign Official 3, for the purpose of, among other things, securing an improper advantage in order to obtain and retain business with Telecom Company, including to win a contract valued at approximately €20,300,000 with Telecom Company.

    b. LM Ericsson, through certain of its employees and agents, including ERICSSON EGYPT, Ericsson AB, Employee 1, Employee 2, Employee 3, Employee 4 and others known and unknown, in order to conceal the true nature of the approximately $2,100,000 in bribe payments, completed a draft due diligence report that failed to disclose the spousal relationship between the owner of Consulting Company and Foreign Official 2. LM Ericsson, through certain of its employees and agents, including ERICSSON EGYPT, Ericsson AB, Employee 1, Employee 2, Employee 3, Employee 4 and others known and unknown, caused Ericsson AB's branch office in Ethiopia to enter into a sham contract with Consulting Company and to approve fake invoices in order to further conceal the bribe payments.

**Overt Acts**

47. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about June 16, 2011, LM Ericsson, through certain of its agents, including ERICSSON EGYPT, Ericsson AB, Employee 1, Employee 2, Employee 3, Employee 4 and others known and unknown, caused Ericsson AB's branch office in Ethiopia and Consulting Company signed a consulting agreement. The services contemplated in the contract were never intended to be performed.

b. On or about August 22, 2011, Employee 2 emailed Employee 1, Employee 4, and others known and unknown, attaching a draft due diligence report on Consulting Company. The draft due diligence report failed to disclose the spousal relationship between the owner of Consulting Company and Foreign Official 2.

c. On or about August 24, 2011, Ericsson AB's branch office in Dubai transferred approximately $1,441,050 – the approximate equivalent at the time of €1,000,000 – through correspondent bank accounts in New York, New York, to Consulting Company's bank account at a bank in Djibouti.

d. On or about October 27, 2011, Ericsson AB's branch office in Dubai transferred approximately $171,703 – the approximate equivalent at the time of €122,000 – through correspondent bank accounts in New York, New York, to Consulting Company's bank account at a bank in Djibouti.

e. On or about March 9, 2012, Ericsson AB's branch office in Dubai transferred approximately $545,230 – the approximate equivalent at the time of €414,000 –

12

through correspondent bank accounts in New York, New York, to Consulting Company's bank account at a bank in Djibouti.

    f.  In or about January 2014, Ericsson AB sent an invoice to Telecom Company in order to receive the final payment under the Telecom Company contract.

    (Title 18, United States Code, Sections 371)

_____
ROBERT ZINK
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

_____
GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

v.

**ERICSSON EGYPT LTD.,**

Defendant.

---

**SUPERSEDING INFORMATION**

S1 19 Cr. _____ (AJN)

(18 U.S.C. § 371.)

GEOFFREY S. BERMAN
United States Attorney

---